IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BARBARA KOLASA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 3534 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| DUNKIN' DONUTS MIDWEST ) | |
| DISTRIBUTING CENTER, INC., | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Barbara Kolasa, a former distribution clerk at defendant Dunkin' Donuts Midwest Distributing Center, Inc. ("DDMDC"), filed this lawsuit against the company, claiming that it discriminated against her based on her age and gender when it fired her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. DDMDC has now filed a motion for summary judgment. In her response, Kolasa moves to voluntarily dismiss her age discrimination claim, and she proceeds only with her claim of gender discrimination. For the following reasons, DDMDC's motion is GRANTED.

## I. FACTS[1]

---

[1] The facts presented here are undisputed. Although each side has labeled some facts "disputed," if the basis for the dispute is not supported by competent evidence, the court treats the fact as admitted. *See* N.D. Ill. L.R. 56.1(a), (b)(3)(C). On its own motion, the court also omits irrelevant facts. Because the court has considered each statement of fact and the opposing side's response, the court uses the abbreviation "DF" to refer both to DDMDC's statement of undisputed facts (R.23) and Kolasa's response (R.27), and the court uses the abbreviation "KF" to refer both to Kolasa's additional facts (R.28) and DDMDC's response (R.32).

-1-

Barbara Kolasa worked as a distribution clerk at DDMDC from October 5, 2005 until her termination in February 2007. (DF ¶3,5.) Nick Jumes, a manager at DDMDC, hired Kolasa and, along with John Jennison, supervised her throughout her employment. (DF ¶¶6,8; KF ¶1.) The parties dispute whether Brian Cach also was Kolasa's supervisor. DDMDC contends that Cach was the warehouse manager and the night-shift supervisor, and that he acted as Kolasa's on-site supervisor during the night shift. Kolasa contends that Cach was responsible only for supervising the "pickers," not her, and that, even if he had supervisory authority over her, she was never told as much. (KF ¶¶9, 10; DF ¶9.) But Kolasa admits that, when she was working additional hours during the week she was fired, she would call Cach each night before she came in to let him know when to expect her. (KF ¶15.) Meanwhile, each night Jumes would call to check in on Kolasa until Jennison arrived. Jumes, who worked a day shift, would then arrive between 5:30 a.m. and 6 a.m., and if Kolasa had any problems or questions she would speak to him about them then. (KF ¶11; DF ¶8.)

Kolasa considered the work environment at the warehouse to be "a bit different" than any other job she had ever had. (KF ¶27.) For the most part there were only two women working in the warehouse office, although at times there were three. (KF ¶27.) (Neither party has said how many people worked in the office.) In the office, there was no language taboo; everyone used swear words, including the pickers, Jumes, Jennison, and Jim Ford. No one ever got in trouble for swearing, which was considered "shop talk." (KF ¶28.)

Initially, Kolasa worked night shifts (from 11 p.m. to 7 a.m.) Monday through Thursday, with an afternoon shift (3 p.m. to 11 p.m.) on Sunday. (KF ¶1.) Her responsibilities included answering the phone, directing calls, communicating with drivers, monitoring driver runs on her

computer, and sorting and filing invoices upon completion of a driver run. (KF ¶2.) On Sunday nights, Kolasa was required to stay until all driver runs were completed and the invoices were sorted and filed. This meant that, at times, she would stay until 2 a.m. (KF ¶2.)

At times, male pickers and drivers were fired or quit, but they would be allowed to return to work the next day. And on one occasion, despite company policy stating that fighting on company premises is grounds for termination, two pickers fought in the warehouse. Jennison saw the fight and broke it up, but neither employee was disciplined. (KF ¶29.)

November 2006 – February 2007

In November 2006, a day-shift position as a distribution clerk opened up. Susan Castillo took the position, leaving the afternoon shift open. Kolasa planned to move from the night shift to the afternoon shift once the company hired someone to take her current hours. (KF ¶3.) After running an ad and conducting interviews, Jumes hired a woman, whom Castillo trained for about three weeks. On the day the new hire was to start the night shift, however, she quit. (KF ¶4.)

While waiting for another distribution clerk to be hired, Castillo and Kolasa shared the afternoon-shift hours. Typically, Castillo would work the day shift until Kolasa's arrival, which was typically between 7:30 p.m. and 9:30 p.m., and Kolasa would then stay until 7 a.m., the end of the night shift. Kolasa did not have the stamina to work twelve-hour days, and the extra work was taking a toll on her. (KF ¶7, 24.) Although she tried to arrive earlier, Kolasa sometimes would not arrive until 10:30 p.m. or 11 p.m. (the beginning of a typical night shift, if there had been three distribution clerks sharing the work). (KF ¶7.) Kolasa considered this a voluntary effort on her part, and she believed she was obligated only to work a night shift during the week of February 25, 2007. Cach testified, however, that Kolasa's shift began at 9 p.m. that week.

(KF ¶¶6,7; DF ¶16.)  Prior to the week of February 25, 2007, however, Kolasa had never been disciplined for tardiness, nor had she ever received a verbal warning or a write-up for any misconduct.  (DF ¶17; KF ¶30.)

Some time before the week of February 25, 2007, the computer showed that a load had been picked, even though it had not been placed on a truck.  When the company learned that the load was not on the truck, Kolasa, along with a picker named Matt Potete, searched the warehouse and found the load.  Kolasa cites this as an example of her "take charge" personality.  (KF ¶12.)

### The Week of February 25, 2007

On Sunday, February 25, 2007, Kolasa again displayed what she considers her "take charge" personality.  That evening she told three pickers, who were under Cach's supervision, to return to work on an unfinished order. (The parties dispute whether this was conveyed as a request or a demand.)  (DF ¶¶11,12.)  One of the three pickers, Greg Wooten, was repairing a company truck at the time, under Cach's orders.  (KF ¶¶13,14; DF ¶¶12,13.)  The other two pickers were taking a short break authorized by Cach.  (DF ¶13.)  Cach was present when Kolasa spoke to the pickers.  (KF ¶14.)

Kolasa was not a supervisor and did not have authority to issue any instructions to the pickers.  (DF ¶14.)  She believed, nonetheless, that she was acting within her duties because the picker's compliance with her request would allow her to timely process an order so that she could leave for the day.  (DF ¶11; KF ¶14.)  She believes Cach was offended when Kolasa "took charge" in that instance.  (KF ¶13.)  Cach, meanwhile, interpreted Kolasa's behavior as giving

directives to employees over whom she did not hold authority, and he considered it rude and disrespectful. (DF ¶15.)

After speaking to the pickers, Kolasa went back to the office and continued her work. (KF ¶14.) Approximately ten minutes later, Cach came into the office and said to Kolasa, "Don't you ever tell one of my workers what to do," and then returned to the warehouse. (KF ¶17.) A few minutes later, Kolasa took Cach aside and said, "I'm sorry if I overstepped my bounds." She contends that Cach then interrupted her by saying, "Then don't." Kolasa says she was offended by his attitude. Cach then said, "Don't you realize that I could send you home right now?" To which Kolasa laughed and said, "You may be all these pickers' supervisor, but you are certainly not mine." (KF ¶18.) The comment angered Cach, who responded, "You know, you need to go back to what you were doing before." Kolasa then went back into the office and finished her work for the evening. (KF ¶19.)

On Monday, February 26, 2007, Kolasa did not report to work at 9 p.m., which Cach testified was the beginning of her shift. Kolasa called Cach at 10:45 p.m. and said she had just woken up and was on her way. (DF ¶16.) Cach told her that the work was almost done and that she need not come in, and so she did not. (KF ¶17.) As a result, Castillo had to remain at work beyond the end of her shift. (DF ¶18.) Cach explained that he disciplined Kolasa because she had not arrived for her shift. (DF ¶16.) Kolasa perceived Cach's tone as rude. (KF ¶16.)

On Tuesday, February 27, 2007, Kolasa did not call Cach before coming to work. Because Kolasa did not arrive until 9:35 p.m., Castillo had to work past her shift. (DF ¶20; KF ¶17.) After Kolasa arrived, Cach came into the office and asked her, in a tone she considered angry, "What time exactly are you supposed to be here?" Kolasa shrugged her shoulders to

indicate she did not know. Cach said, in a tone that Kolasa perceived as hostile, "Well, let's make it 9 p.m." Kolasa then said, "Fine, then what time do I stay until?" To which Cach counted on his fingers (in a manner that Kolasa perceived as condescending) and said, "Five a.m." Kolasa said, "Fine." (KF ¶20.)

That same night, Kolasa was informed that another newly hired distribution clerk (who had begun just two days earlier) had quit the night before. (DF ¶21.) Some time after her conversation with Cach, she and Castillo began discussing the prospect of training another distribution clerk. In the midst of that conversation, Kolasa rose from her desk to put something away and said, referring to the prospect of hiring and training yet another new distribution clerk, "You know, that's fine, I just don't give a [expletive] about it anymore." (KF ¶21.) (The parties dispute whether she used the expletive "shit" or "fuck.")

Cach, who was also in the office, rose from his desk and said, "If you don't give a shit then go home." Kolasa responded, "I will go home when my shift is over." (Cach testified that she said, ". . . when my damn shift is over"; Kolasa denies it.) (DF ¶22.) Cach then said, "No, you will go home now. You're fired." Kolasa then asked, "On what grounds?" And Cach said, "Insubordination." (KF ¶22.) Believing that she had not refused to do anything that she had been asked to do, Kolasa asked Cach how she had been insubordinate. Cach said, "Get out or I'll call the police and have you escorted out," and told her to give him her keycard. Kolasa said, "No, if I give it to anyone it will be Nick Jumes, my immediate supervisor." She then left. (KF ¶22.) At the time, Kolasa did not return her keycard. (DF ¶23.) Cach perceived her attitude to be angry and hostile. (DF ¶23.) Cach contends that several employees heard this exchange and that it was disruptive to the workplace. (DF ¶24.)

Post-February 27, 2007

The parties dispute whether Jumes met with Kolasa on the day after the incident, February 28, 2007. According to Jumes, they met in person on that day. During their onversation, he testified, Kolasa said she was unable to work with Cach and loudly remarked, "Fuck Bryan." Jumes says he asked Kolasa to sit down to discuss the matter, but she refused and left. (DF ¶25.)

Kolasa flatly denies that she met with Jumes and testified that they spoke only on the phone. According to Kolasa, she called Jumes repeatedly to speak to him, and he finally answered her phone call at 6 a.m. on an unspecified date. Kolasa says she said to Jumes, "Bryan fired me, and how can that be, or is that true, for Bryan is not my supervisor, am I fired?" She says Jumes responded, "If Bryan says you're fired, you're fired." Kolasa says she then asked Jumes if she could discuss the incident with him at the office and he said, flatly, "No, that would not be a good idea." (KF ¶25.)

After the incident, Jumes spoke to Cach, who also provided him with statements from other employees about the February 27 incident. Based on this information, Jumes concluded that Kolasa had acted inappropriately (1) on February 25, when she purported to give orders to employees whom she did not supervise, (2) on February 26, when she waited an hour and 45 minutes after her shift began before contacting Cach, (3) on February 27, when she was 35 minutes late, engaged in inappropriate conduct toward her supervisor, and disturbed the work place with a loud, profane outburst. (DF ¶26.)

Jumes says he reviewed time records and talked to other employees, and that based on this review he discovered that Kolasa had often been tardy during her employment, which often

required Castillo to remain past her scheduled end time, costing the company overtime pay. (DF ¶27.) (Castillo confirmed this in her affidavit.) Jumes also says he learned that Kolasa had addressed other employees in a rude manner, that she would leave for periods beyond her allotted break time, and that she did not complete all of the work she was supposed to do in a shift, requiring the next clerk to complete her work. (DF ¶27.)

<u>March 5, 2007</u>

Jumes testified by affidavit that Kolasa was again given the opportunity to discuss the incident on March 5, 2007, in a meeting with Jumes and Tom Jensen, the general manager of DDMDC. (DF ¶28.) Jumes says that, at the meeting, Kolasa insisted that she had neither yelled nor used profanity at anyone, and she claimed that she was terminated only because she had hurt Cach's ego by telling one of his pickers to get back to work. (DF ¶28.)

In her response to this fact, Kolasa does not deny that she met with Jumes and Jensen on that date, nor that she did not take responsibility for her actions or acknowledge that she had done anything wrong; she denies only the notion that Jumes allowed her to tell her side of the story. (DF ¶¶28, 29.) Elsewhere in her response to DDMDC's facts, however, she denies that the meeting even occurred. (DF ¶7.) She cites no evidence to rebut Jumes's testimony that the meeting occurred, however, other than this testimony:

> "Now after [the February 27, 2007] incident I called Nick Jumes repeatedly to speak to him and he would not answer me at all, until finally he answered his phone at 6:00am, I told him briefly that Bryan fired me, and how can that be, or is that true, for Bryan is not my supervisor, am I fired? Nick then told me if Bryan says you're fired, you're fired. I then asked him to come in the office and speak to him regarding the incident and he flat out told me no, that would not be a good idea."

Because Kolasa's testimony does not contradict Jumes's testimony that they met on March 7, 2007, nor has she pointed to any other evidence that would rebut his testimony, the court treats the fact of the March 7, 2007 meeting as admitted. *See* N.D. Ill. L.R. 56.1(b)(C).

Jumes testified that he did not change the decision to terminate Kolasa after the March 5, 2007, meeting because of her behavior on February 25, 26, and 27; her insubordinate and disruptive conduct on February 27; his understanding that she had exhibited similar behavior in the past; and her failure to acknowledge or recognize that she had done anything wrong. (DF ¶30.)

Jumes and Cach both testified that Kolasa's gender played no role in the decision to terminate her. (DF ¶31.)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in her pleadings or conclusory statements in affidavits; she must support her contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary

judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove sex discrimination, Kolasa may use the direct or indirect methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or she can combine both approaches. *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007). "[T]he pertinent question in a Title VII case is not whether a plaintiff has direct (including circumstantial) or indirect proof of discrimination, but whether she has presented sufficient evidence that her employer's decision was motivated by an impermissible purpose." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005), citing *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638 (7th Cir. 2001) (internal quotation marks, brackets, and ellipses omitted).

<u>The Direct Method</u>

Kolasa initially argues that she has sufficient evidence to support her claim of discrimination under the direct method, which requires direct evidence (i.e., that which can be interpreted as an acknowledgement of discriminatory intent by the defendant or its agents) and/or circumstantial evidence (i.e., evidence that allows a trier of fact to infer intentional

discrimination). *Rudin*, 420 F.3d at 720. Circumstantial evidence from which a factfinder may infer discriminatory intent includes: "[1] suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn . . . [2] evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the [protected] characteristic . . . received systematically better treatment . . . [3] evidence that the plaintiff was qualified for a job but passed over in favor of (or replaced by) a person not [in the protected group] . . . and that the employer's stated reason for the difference in treatment is unworthy of belief." *Rudin*, 420 F.3d at 720-21 (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)). To survive summary judgment, Kolasa had to put forth a "convincing mosaic of circumstantial evidence" that would support a jury's finding of gender discrimination. *See Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotation marks omitted).

Kolasa argues that a jury could infer discrimination based on the facts presented. But Kolasa, who is represented by an attorney, does not highlight which of the facts would support such a conclusion, nor does she provide any argument on this score—and the court will not advance legal arguments on her behalf. *See County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006). In failing to identify any such evidence, Kolasa has forfeited the argument. *See Salas v. Wis. Dep't of Corrections*, 493 F.3d 913, 924 (7th Cir. 2007). And even if she had not forfeited the argument, it would not succeed: The record contains no direct evidence of gender discrimination and virtually no circumstantial evidence of it, either. Kolasa offered only her testimony that (1) generally, there were only two women working in the

warehouse office (the size of which is not apparent from the record); (2) at times, male pickers and drivers who were fired (for reasons that are not apparent on this record) were allowed to return; and (3) on one occasion, two male pickers who violated company policy by fighting were not disciplined at all by Jennison (a supervisor who was not involved in the decision to terminate Kolasa). This anecdotal, nonspecific evidence is not a "convincing mosaic" from which a jury could infer gender discrimination. *See Davis*, 368 F.3d at 783. Accordingly, the court agrees with DDMDC that Kolasa has not put forth sufficient evidence of gender discrimination under the direct method.

### The Indirect Method

Kolasa also proceeds under the indirect method, which requires her to make out a prima facie case of gender discrimination by showing that (1) she is a member of the protected class (2) who suffered an adverse employment action (3) despite the fact that she was meeting DDMDC's legitimate expectations, and that (4) DDMDC treated similarly situated male employees more favorably. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007). If she makes such a showing, DDMDC must offer a legitimate, nondiscriminatory reason for firing her, which Kolasa may rebut by showing that the reason is a pretext for discrimination. *See id.*

Because Kolasa contends, in essence, that DDMDC is lying about its employment expectations, the pretext question and the "legitimate expectations" prong of the prima facie case are closely related and will be considered together. *See id.* at 687-88; *United Airlines, Inc. v. Gordon*, 246 F.3d 878, 886 (7th Cir. 2001). The court begins, however, with the fourth prong of the prima facie case: whether similarly situated male employees were treated differently.

Although the "similarly situated" requirement is flexible, Kolasa still had to identify an employee with "sufficient commonalities on the key variables . . . to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008). This would normally entail a showing that Kolasa and the comparators shared the same supervisor and performance standards and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick*, 510 F.3d at 688. An employee need not show complete identity in comparing herself to a better treated employee, but she must show substantial similarity. *Humphries*, 474 F.3d at 405.

Here, Kolasa argues that her examples of male employees fighting and using foul language without being subject to discipline, along with her examples of male employees being allowed to return to work after being fired, are enough to satisfy this prong. But the court agrees with DDMDC that Kolasa has not provided enough information about any of these male employees, whom she does not name, to allow a meaningful comparison. First, Kolasa has not explained what duties the would-be comparators had at the company, when they worked there, or who their supervisors were. Second, she has not identified comparable conduct—be it defiance of authority, tardiness, a disruptive outburst, or a refusal to admit wrongdoing. She points to male employees' use of foul language, but that was not cited as a reason for her termination: although Jumes concluded that Kolasa had a loud, profane outburst on February 27, it has never been suggested that she was fired for using profanity rather than for exhibiting a negative attitude and behaving insubordinately in that outburst. She does cite an example of two male

employees who had a physical fight—a similarly (if not more) disruptive event—but according to Kolasa it was a different supervisor, Jennison, who had observed the fight and opted not to discipline the employees. Whether Jumes or Cach—the decisionmakers in Kolasa's case—would have done the same is unknown. Meanwhile, for the men whom she said were fired but allowed to return to work, she does not identify the conduct that initially caused them to be fired (or any other information about them). Because Kolasa has not identified male employees with enough commonalities on the key variables to allow a meaningful comparison, she has not satisfied this prong. *See Humphries*, 474 F.3d at 405 (explaining that "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel . . . .")

Although that failure dooms Kolasa's case, for the sake of completeness, the court notes that Kolasa also has not presented sufficient evidence that she was meeting DDMDC's legitimate expectations, nor that its reasons for terminating her were pretextual. Jumes offered a number of reasons for Kolasa's termination: (1) giving orders to employees over whom she did not have authority; (2) insubordinate and disruptive conduct; (3) tardiness; and (4) failing to acknowledge, in her meeting with Jumes, that she had done anything wrong. To survive summary judgment, Kolasa had to establish doubt as to all of these reasons, and not just one. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995).

As for the first reason, Kolasa admits that on February 25, she asked pickers to finish an order, despite the fact that they were all doing things that Cach, their supervisor, had ordered or authorized them to do. She does not contend that she had authority to give them orders (other than her belief that, if the pickers complied, it would be easier for her to fulfill her duties).

Indeed, she acknowledged to Cach that she may have "overstepped [her] bounds." Thus, viewing the facts in the light most favorable to Kolasa, even if she had merely asked the pickers to do something other than what Cach had ordered or authorized them to do, Cach could have legitimately concluded that Kolasa had disrespected his authority. Kolasa, in any event, has not offered any reason to disbelieve this was one of the reasons she was fired.

As for the second reason, Kolasa does not dispute that she challenged Cach's authority; she contends only that Cach was not her supervisor, or at least that she had not been told as much. But she admits that Cach was the on-site supervisor, and that she would call him to let him know when she would arrive for work. And when she called Cach at 10:45 p.m. on February 26 and was told she need not come in, she did not protest that he did not have authority to tell her whether she needed to work or not. Nor does she dispute that Cach had authority to set her hours, as he did on February 27 when he told her that she should arrive by 9 p.m. Given these admissions, no reasonable jury could conclude that Cach did not have some authority over Kolasa, nor could a jury conclude that Kolasa was not aware, at least on some level, that he possessed that authority. Under such circumstances, her conduct—twice verbally denying that he had authority over her, refusing to surrender her keycard after he fired her—could legitimately have been seen as insubordinate. Again, Kolasa has not offered any reason to disbelieve Jumes and Cach's testimony that she was fired in part for this behavior.

Meanwhile, although there is a genuine dispute over whether DDMDC clearly communicated its expectations about Kolasa's hours before the week of February 25, Kolasa has not pointed to any evidence to support her claim that Cach or Jumes are lying about what their expectations were for her work hours during that week. A pretextual rationale is more than

-15-

simply "faulty reasoning or mistaken judgment." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "An employer's explanation can be foolish or trivial or even baseless so long as it honestly believed the proffered reasons for the adverse employment action." *Id.* (internal quotation marks and citation omitted). Here, if Kolasa's testimony is believed, tardiness would be a baseless rationale for firing Kolasa (next to three well-supported reasons). But Kolasa does not contend that Jumes or Cach did not honestly believe that Kolasa was scheduled to work at 9 p.m. that week, nor that they did not honestly think she was an hour and 45 minutes late on February 26, and 35 minutes late on February 27. In short, she's put forth no evidence to undermine this part of their explanation.

Lastly, Kolasa admits that she did not acknowledge that she had done anything wrong, and she does not dispute that this was part of Jumes's rationale in deciding not to give her a second chance. In the end, it may have been the most important reason of all.

## IV. CONCLUSION

Because Kolasa has not presented sufficient evidence upon which a jury could conclude that DDMDC discriminated against her because of her gender, the court **GRANTS** DDMDC's motion for summary judgment.

**Enter:**

/s/ David H. Coar
_____
David H. Coar

United States District Judge

Dated: **July 1, 2009**